## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JULIE A. SU, *Acting Secretary of Labor,*
*United States Department of Labor,*

      Plaintiff,

    v.

      Civil Action No. TDC-20-3585

SPEARMAN, INC.,
*d/b/a Ledo's Pizza Seabrook,*
RMS ENTERPRISE, INC., *d/b/a Ledo's Pizza*
*Greenbelt and Ledo's Pizza Bowie,*
JMS ENTERPRISES, INC.,
*d/b/a Urban Bar-B-Que,* and
ROBERT TONY SPEARMAN, *individually,*
*owner, and as manager of the aforementioned*
*corporations,*

      Defendants.

### MEMORANDUM OPINION

    The United States Secretary of Labor ("the Secretary") has filed this civil action against Defendants Spearman, Inc., RMS Enterprise, Inc., JMS Enterprises, Inc., and Robert Tony Spearman, alleging violations of the recordkeeping, minimum wage, and overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2018). The Secretary has filed a Motion for Partial Summary Judgment on liability, which is fully briefed. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

### BACKGROUND

### I.    Corporate Structure

    During the time period relevant to this case, Defendant Robert Spearman ("Spearman") was the sole owner of three corporations that operate restaurants in Maryland, including the Ledo's

Pizza restaurants in Lanham, Greenbelt, and Bowie, Maryland and the Urban Bar-B-Que in Bowie, Maryland. These companies consist of Spearman, Inc. ("SI"), which owns and operates the Ledo's Pizza in Lanham, Maryland ("Ledo's Pizza-Seabrook/Lanham"); RMS Enterprise, Inc. ("RMS"), which owns and operates the Ledo's Pizza locations in Greenbelt, Maryland ("Ledo's Pizza-Greenbelt") and in Bowie, Maryland ("Ledo's Pizza-Bowie"); and JMS Enterprises, Inc. ("JMS"), which owned and operated the Urban Bar-B-Que in Bowie, Maryland while it was in business from 2015 to November 2019. From at least April 3, 2016 to January 3, 2022 ("the relevant time period"), Spearman was the president, manager, and sole owner of both SI and RMS. He had the same roles with JMS during the time period of the operation of Urban Bar-B-Que.

During the relevant time period, SI and RMS, through the three Ledo's Pizza restaurants, both had gross sales of over $500,000 each calendar year. SI and RMS also engaged in interstate commerce by purchasing food and supplies from U.S. Food, a company based in Virginia which transported goods from Virginia to Maryland for use by the Ledo's Pizza restaurants. Employees at SI and RMS worked as servers, cashiers, pizza-makers, or grill cooks and were interchangeable across positions. SI also employed delivery drivers.

As for JMS, it is undisputed that in each calendar year from 2016 to 2018, JMS, through Urban Bar-B-Que, had annual gross sales of over $500,000. The gross sales during 2019, up to the closure in November 2019, were less than $500,000. From 2016 to November 2019, Urban Bar-B-Que accepted and processed credit card transactions. Employees at JMS worked as cashiers and grill cooks.

Spearman was involved in the day-to-day operations of all three businesses. For all three companies, Spearman trained the managers; set the work rules such as those relating to the dress code; participated in the hiring, disciplining, and firing of employees; supervised employees; and

2

set work schedules. In particular, Spearman was responsible for determining compensation policies, including the rate and method of pay and pay deductions for employees; setting procedures for clocking in and out; and maintaining employment records.

Spearman also signed leases and vendor agreements, opened credit cards for the businesses, contracted with payroll companies, and developed and implemented payroll policies. Spearman used the same payroll company for SI, RMS, and JMS and was primarily responsible for compiling and submitting payroll information to that company for processing. Spearman reviewed and sent the payroll information for at least two of the restaurants using the same computer located at Ledo's Pizza-Greenbelt, with the data for Ledo's Pizza-Greenbelt saved to the computer and the data for Ledo's Pizza-Seabrook/Lanham saved to thumb drives. Spearman also used the same credit card, issued to SI, in business transactions for all three companies.

According to Spearman, supplies were shared across the companies. For example, SI and RMS shared food supplies such as pepperoni. SI, RMS, and JMS also "shared staffing" on an as-needed basis, and Spearman viewed managers and cooks as a "common pool to work at multiple locations." Joint Record ("J.R.") 855, ECF Nos. 71-1 to 71-26.

## II.    Recordkeeping

During the relevant time period, SI, RMS, and JMS each collected and stored certain employee records, including employee time and compensation records, on software systems. During the United States Department of Labor ("DOL") investigation underlying this case, Defendants produced only "partial payroll, time records, and a 2019 tip summary sheet" for the relevant time period. J.R. 1646. Additional payroll records were provided to DOL by Defendants' payroll processing companies. Collectively, these records contain data on work hours, deductions,

3

tips, pay rates, gross pay, and net pay for some employees within the time periods at issue in this case, but the records do not encompass all employees or the full relevant time period.

Spearman has acknowledged that "from at least 2016," Defendants did "not always keep records." J.R. 530. SI and RMS have no time records prior to March 11, 2018. JMS has acknowledged that it "has no time records . . . as they were lost as a result of [its] eviction." J.R. 477. The records currently maintained by Defendants are limited in numerous ways. Spearman has acknowledged that the time and payroll records contain errors, including as to hours and weekly pay. Spearman has stated that the available records only "partially reflected" the hours worked by employees and "may or may not reflect the total time period worked by each employee, but they at least reflect some periods of time that those employees worked." J.R. 134.

Defendants also did not maintain all payroll records for the relevant period. SI has acknowledged that it "has no [payroll] records for 2016." J.R. 139. Spearman has admitted that some of JMS's payroll records for the relevant period were exclusively maintained in paper and are no longer in JMS's possession. Moreover, the available payroll records were not always accurate. Upon review of the records, DOL Wage and Hour Investigator Claudia Villarreal "identified discrepancies between the hours worked, wages paid, and tips received that were listed in Defendants' payroll records . . . and the hours listed in the timesheets Defendants produced during the DOL investigation." J.R. 1649. The payroll records did not always document accurate pay rates. Although Spearman has stated that he is responsible for sending the correct pay rate information to the payroll companies for processing, he has admitted that RMS payroll records and pay stubs did not accurately record different pay rates when employees worked in multiple roles during their shifts. Rather, certain RMS employees' payroll records and paystubs listed their

4

hourly rates as "multiple" and did not specify how their total wages were calculated.  J.R. 1991-94.

Defendants also do not have complete records of the duration of employment for all of its employees.  For example, Defendants lack records reflecting the start dates, end dates, or both for 27 current or former employees identified by the Secretary.  JMS has "no personnel records other than the applications" for its employees.  J.R. 480.

As for overtime, SI and JMS have acknowledged that that their timekeeping system did not recognize when overtime hours had been worked, did not account for the fact that employees must be paid for such hours at a time-and-a-half rate, and did not automatically calculate the rate and amount due for overtime.

**III.    Minimum Wage**

Defendants have asserted that under their compensation policies, all employees started working at the minimum wage or above, except that "a server would start below the hourly minimum wage but would keep all tips" and receive additional compensation as needed to bring total compensation to the minimum wage.    J.R. 177-78.   According to Spearman, from at least 2015, he made deductions from employees' paychecks pursuant to an agreement with employees that they would receive pay deductions for "food purchases, non-food purchases, uniforms, and [cash register] shortages."   J.R. 340.   However, after reviewing the available records and conducting employee interviews, Investigator Villarreal concluded that Defendants had failed to pay 181 employees the federal minimum wage for at least some of their hours worked during the relevant time period.

In their responses to interrogatories, Defendants have acknowledged that, even before any such deductions, at least seven employees were paid below the federal minimum wage of $7.25

5

per hour at certain times during the relevant period, including RMS employees Jonathan Escobar, Oludotun Plumpter, Marlene Medina, Alanna Rall, Nakia Jackson, Younoussa Sidibe, and Devonta Hallman. Several of these employees were paid below the minimum wage across multiple pay periods. Escobar, for example, was paid at a rate of $6.79 per hour on July 3, 2017 before any deductions and at $6.65 per hour on August 14, 2017 before any deductions. For certain other employees, the deductions imposed by Spearman caused their hourly rate to fall below the federal minimum wage. At least for SI and RMS, Spearman has asserted that he made some downward adjustments to employees' recorded hours worked based on his observations that their recorded hours did not accurately reflect the hours actually worked during the pay period, and that he sometimes orally notified the particular employee of the change. Based on her investigation, Investigator Villarreal calculated that "based on time sheets, payroll records, and employee statements," Defendants owe $234,069.74 in back wages for federal minimum wage violations to the employees identified by the Secretary. J.R. 1649.

As for tipped employees, primarily consisting of servers, Defendants have acknowledged and identified at least 19 RMS employees who "had hourly wages augmented by tips or only tips without any set hourly wage," J.R. 178, and have asserted that they are subject to the FLSA's tip credit provision, 29 U.S.C. § 203(m)(2), under which their hourly wage and earned tips can be combined to establish compliance with the FLSA's minimum wage requirement. Of these employees, eight were not paid any hourly wage, as required by the FLSA. Defendants also failed to create and maintain records documenting that they claimed a tip credit for such employees from 2016 through 2018 and from 2020 through 2021. Although Defendants have certain payroll records listing tips paid to tipped employees, the records do not cover all pay periods for which

6

the tip credit was arguably applicable, and in some of the pay periods with listed tips, the employee received no hourly wage.

Although Defendants have produced a set of four "Tip Credit Employee Notification" forms issued to certain employees, they do not cover any of the 19 RMS employees claimed to be subject to the tip credit. *E.g.*, J.R. 1307. These forms are also incomplete. For example, the notifications forms issued to Plumpter and Vanessa Reyes leave blank the spaces to list the base hourly wage and the amount that Defendants claimed as a tip credit.

**IV.    Overtime Pay**

Spearman has acknowledged that several of Defendants' employees worked overtime hours during their employment. He has also admitted that he paid at least two employees, Eric Knott and Ana Julia Moreno Canales, straight time when they should have been paid at the overtime rate. Significantly, Defendants have identified certain specific RMS employees who are owed unpaid overtime compensation, including: Canales, Yesenia Ferman, and Sandra Ferman. Defendants have admitted that calculations relating to these employees "indicate a failure to comply with [the] FLSA." J.R. 270. Further, Defendants have acknowledged that at least two employees, John Ukpabi and Bryan Flom, worked at multiple restaurants in the same week but did not have their hours aggregated for payroll purposes, such that they worked more than 40 hours in a week but did not receive overtime pay. Specifically, Defendants have acknowledged that they owe overtime pay to Ukpabi for 17 separate pay periods and to Flom for 5 separate pay periods.

Through a review of "Defendants' timesheets, payroll records, and employee interviews," Investigator Villarreal concluded that Defendants failed to pay 36 employees the overtime premium rate "for all hours worked over 40 in a workweek during the relevant time period." J.R. 1649. She calculated that Defendants owe $53,617.26 in unpaid overtime compensation.

7

## V.     The Complaint

Following the DOL investigation, the Secretary filed the present action in this Court. In the presently operative Amended Complaint, the Secretary alleges violations of the recordkeeping, minimum wage, overtime provisions of the FLSA, in violation of 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2) and (5). As relief, the Secretary seeks damages in the form of unpaid minimum wages, overtime pay, and liquidated damages and, pursuant to 29 U.S.C. § 217, a permanent injunction barring any future violations of the recordkeeping, minimum wage, and overtime pay provisions.

## DISCUSSION

In the Motion for Partial Summary Judgment, the Secretary seeks summary judgment on liability for violations of the recordkeeping, minimum wage, and overtime pay requirements of the FLSA. The Secretary argues that the record evidence establishes that there is no genuine issue of material fact on whether Defendants violated these provisions, whether they acted willfully, and whether they did not make good faith efforts to comply with the FLSA as necessary to avoid liability for liquidated damages.

## I.     Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under

8

the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II.    Employee Declarations and Statements

As a threshold issue, Defendants argue that in considering the Motion, the Court should not consider 14 declarations, each signed under penalty of perjury by an employee of one of Defendants, and 9 written personal interview statements that were submitted to Investigator Villarreal.    These declarations and statements related to the employees' "relationship with Defendants, job duties, work hours and schedules, wages and Defendants' recordkeeping and compensation practices." J.R. 1647. Defendants argue that the declarations and statements may not be considered pursuant to Federal Rule of Civil Procedure 56(c)(4) because the names of the employees who submitted them have been redacted, and because some include hearsay evidence.

Rule 56(c)(4) requires that an affidavit or declaration used to support a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In response to Defendants' objection to the lack of disclosure of the identities of the employees who submitted these statements, the Secretary argues that such redactions are permissible because the "informer's privilege" applies to FLSA cases. *See Wirtz v. B.A.C. Steel Prods., Inc.*, 312 F.2d 14, 16 (4th Cir. 1962). Under the informer's privilege, which is most typically applied in criminal cases, the Government may "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement." *Id.* In *Wirtz,* the

9

United States Court of Appeals for the Fourth Circuit held that in an FLSA enforcement action based on a DOL investigation, there is a similar, qualified privilege that permits the Secretary to withhold the names of employee witnesses in discovery, on the grounds that "preserving their anonymity" is necessary to obtain the information required to enforce the law because the "average employee involved in this type of action is keenly aware of his dependence upon his employer's good will, not only to hold his job but also for the necessary job references essential to employment elsewhere." *Id.* at 16 (reversing the dismissal of an FLSA civil enforcement action for failure to disclose the employee witnesses names in discovery). Other courts have similarly held that the informer's privilege permits the withholding of employee witness names in an FLSA civil enforcement action. *See, e.g.*, *Brock v. On Shore Quality Control Specialists, Inc.*, 811 F.2d 282, 283 (5th Cir. 1987) (citing *Roviaro*, 353 U.S. at 59). Although the privilege is not absolute, a party challenging the privilege must show a "special circumstance which would justify withdrawing the qualified privilege from the government." *Wirtz*, 312 F.2d at 16.

While *Wirtz* did not specifically address whether the informer's privilege remains intact during the litigation of a motion for summary judgment, the Court will permit it to do so here. In determining whether the privilege applies, federal courts generally balance "the public's interest in efficient enforcement of the [FLSA], the informer's right to be protected against possible retaliation, and the defendant's need to prepare for trial." *On Shore Quality Control Specialists, Inc.*, 811 F.2d at 283. Here, while the typical interests in confidentiality continue to apply, the case has not yet proceeded to trial, so interests relating to trial preparation are not yet at issue, particularly where the Secretary has already provided the names of all of Defendants' employees who could potentially be owed unpaid minimum wages and overtime pay. Where a motion for summary judgment is considered on documentary evidence without the kind of credibility

determinations made at trial, Defendants have not demonstrated why the names of the employees offering the declarations are required at this stage. *See Anderson*, 477 U.S. at 255 (stating that a judge does not engage in credibility determinations when ruling on a motion for summary judgment because "[c]redibility determinations . . . are jury functions"); *Scalia v. Ghosn*, 451 F. Supp. 3d 1215, 1220-21 (W.D. Okla. 2020) (on a motion for summary judgment, considering pursuant to the informer's privilege anonymous employee statements contained within a DOL investigator's affidavit). Here, where the declarations, on their face, state that they are made under penalty of perjury and thus satisfy the requirements of Rule 56(c)(4), the Court finds that they may be considered as part of the record on the Motion. *See* 28 U.S.C. § 1746 (defining a declaration). In so ruling, the Court does not reach the issue of whether the witness statements not signed under penalty of perjury, or not signed at all, may be relied upon because the Court finds that it need not, and thus does not, rely on them in ruling in the Motion.

Defendants' objection that certain declarations do not assert or show that the employees making the statements are competent to testify, which is a requirement of Rule 56(c)(4), do not alter this conclusion. On their face, the factual assertions in the declarations generally evince personal knowledge on the part of the employee. *See* Fed. R. Civ. P. 56(c)(4). Moreover, Investigator Villarreal has stated in her own declaration that the statements she collected "were based on the employees' personal knowledge." J.R. 1647. As Defendants present no contrary evidence suggesting that the witnesses lack personal knowledge or are not competent to testify, this objection fails.

Defendants also raise individual hearsay objections to two employee declarations, Declaration 2 and Declaration 4, because they explicitly include statements of employees other than the declarant. While Defendants do not identify the specific language at issue, the Court

construes the objection to Declaration 2 to relate to the declarant's statement that other employees complained to the declarant about underpayment, and the objection to Declaration 4 to relate to the declarant's statement that "at least one other coworker dealt with the same paycheck issues with Ledo's Pizza-Bowie." J.R. 1190. The Secretary argues that these statements are found within DOL business records and thus admissible under Federal Rule of Evidence 803(6), but without deciding whether they so qualify, the Court finds that the identified portions contain information observed not by a DOL employee, or even the employee interviewed, but by other employees who spoke to the declarants, so they are in any event not admissible because they are hearsay within hearsay. Fed. R. Evid. 805. The Court therefore will not consider these two statements in deciding the Motion.

## III.   FLSA Coverage

Defendants assert that there are genuine issues of material fact on certain issues relating to whether they are covered entities under the FLSA. Specifically, they argue that the claims relating to employees of JMS fail because (1) JMS is not subject to FLSA coverage because it did not have more than $500,000 in sales in 2019, in part because of its November 2019 closing; and (2) JMS did not engage in interstate commerce.

### A.   Enterprise Engaged in Commerce

To be subject to the requirements of the FLSA, a business must be an "[e]nterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a), 203(s)(1). To qualify as such an enterprise, the business must be one "whose annual gross volume of sales made or business done is not less than $500,000" and which "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person."

12

*Id.* § 203(s)(1)(A)(i)-(ii). The term "commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. §§ 203(b).

Defendants do not dispute that SI and RMS meet these requirements. However, they argue that JMS does not constitute an "enterprise engaged in commerce" for two reasons. First, they argue that the Secretary has not identified evidence that would support a finding that JMS employees at Urban Bar-B-Que were "engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a)(1). Rather, Defendants argue that, based on the available evidence, JMS was headquartered in Maryland, JMS received no goods from outside of Maryland, and all of the companies with which JMS dealt were in Maryland. Although the Secretary has provided evidence that Defendants' Ledo's Pizza restaurants regularly received supplies from U.S. Food, a distributor located in Virginia, it has not identified evidence that JMS or its employees at Urban Bar-B-Que engaged in interstate commerce other than the fact that JMS employees processed credit card transactions relating to its sales. Spearman has acknowledged that Urban Bar-B-Que accepted credit cards from 2016 to November 2019. Although processing credit card transactions may provide evidence in support of the commerce requirement, the Secretary has cited no authority establishing that such activity is alone sufficient to establish that a business is covered by the FLSA. *See Rains v. E. Coast Towing & Storage*, 820 F. Supp. 2d 743, 749 (E.D. Va. 2011) (finding that the commerce requirement was met based on evidence "taken together" that the towing company at issue used trucks manufactured out-of-state, accepted credit card payments, and towed vehicles with out-of-state license plates).

Second, they assert that although Urban Bar-B-Que had over $500,000 in annual sales in the years from 2016 to 2018, it did not reach that level of sales in 2019, the year that it closed

13

down. Although the Secretary does not claim that Urban Bar-B-Que had at least $500,000 in sales in 2019, it argues that JMS still meets the sales requirement because the calculation of the qualifying gross sales for FLSA coverage is not limited to sales occurring within a single calendar year. The Secretary is correct that the analysis of gross sales is not limited to a single calendar year or a fiscal year. *Burnley v. Short*, 730 F.2d 136, 138 (4th Cir. 1984). However, when there is a question whether the requisite level of annual gross sales is satisfied, the volume of sales is to be calculated at the beginning of each quarter-year, at which time the total gross receipts from all sales in the preceding 12 months, or four quarters, are aggregated to determine whether they add up to $500,000 or more, in what is known as the "rolling quarters" method. 29 C.F.R. § 779.266(b) (2023); *Burnley*, 730 F.2d at 138 (citing 29 C.F.R. § 779.266(b)) (referring to this approach as the "rolling quarters" method). Here, the parties have not provided sufficient record evidence to apply the rolling quarters method for 2019. The Court therefore cannot find that JMS satisfied this requirement for quarters beginning on or after January 1, 2019.

## B.    Single Enterprise

Nevertheless, the questions relating to whether JMS meets the interstate commerce requirement or the revenue requirement need not be resolved because, as the Secretary has correctly argued, Defendants constitute a single enterprise such that they are collectively subject to the requirements of the FLSA. *See* 29 U.S.C. § 203(r). The FLSA defines an individual "enterprise" in part as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units." 29 U.S.C. § 203(r)(1); *Brock v. Hamad*, 867 F.2d 804, 806 (4th Cir. 1989). "Common control" exists "where the performance of the described activities [is] controlled by one

14

person or by a number of persons, corporations, or other organizational units acting together." 29 C.F.R. § 779.221; *see Hamad*, 867 F.2d at 807. A "common business purpose" is found where activities are "directed to the same business objective or to similar objectives in which the group has an interest." 29 C.F.R. § 779.213; *see Hamad*, 867 F.2d at 807.

The Court finds that the evidence establishes that Defendants constitute a single enterprise. First, Defendants engaged in related activities. SI, RMS, and JMS are all restaurant businesses that sell prepared food to customers, and all three entities operated within Prince George's County, Maryland, with Ledo's Pizza-Bowie and Urban Bar-B-Que located in the same shopping center. SI and RMS both operate Ledo's Pizza restaurants, just in different locations. While JMS operated an Urban Bar-B-Que restaurant and thus served a different kind of food, entities that provide similar functions can still be "related activities" even if under different brands and in different locations. *See Hamad*, 867 F.2d at 806 (finding that multiple single-family homes rented by Hamad Realty, and an apartment complex operated by Greenfield Properties, were related activities and constituted a single enterprise). Second, the record is clear that, through Spearman, there was common control of all three Defendants and the restaurants they operated. As established by interrogatory responses and Spearman's deposition testimony, Spearman was the 100 percent owner and operator of all three entities. Moreover, it is undisputed that Spearman "was involved in the day-to-day operations" of all four restaurants, including the hiring, disciplining, firing, and compensation of employees, the signing of lease and vendor agreements, the opening of business credit cards, and the setting and implementing of payroll policies. Mot. Summ. J. ¶ 14, ECF No. 66 (asserting an undisputed fact); Opp'n at 2, ECF No. 68-1 (not objecting to this fact). In particular, Spearman acknowledged in his deposition that he personally processed payroll for multiple entities at a single store. Such management and oversight across all three

entities is sufficient to establish common control. *See Hamad*, 867 F.2d at 807 (finding common control where all of the relevant rental unit properties were managed, controlled, and owned by the defendant, his wife, or his mother). Third, the entities shared a common business purpose, as they "sell food and beverages to paying customers." *See Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 892 (D. Md. 2011) (finding that two different taverns had this common business purpose).

The record evidence also shows that the individual restaurants and their corporate entity owners contributed to the others' continuing operations with supplies and employees. In his deposition, Spearman admitted that Ledo's Pizza-Seabrook/Lanham, owned by SI, and Ledo's Pizza-Greenbelt, owned by RMS, shared ingredients such as bags of pepperoni. An employee has stated in a declaration that Spearman transported cups, straws, boxes, and pizza ingredients between those two Ledo's Pizza restaurants, and another employee stated in a declaration that all three Ledo's Pizza restaurants used the same cheese grating machine located at Ledo's Pizza-Bowie, and that Spearman transported grated cheese from that location to the other Ledo's Pizza restaurants. Spearman has not disputed these assertions. Although the first of these employees also stated that Spearman's ex-wife transported materials such as cups and straws between Ledo's Pizza-Bowie, owned by RMS, and Urban Bar-B-Que, owned by JMS, Spearman has denied that any food or supplies were exchanged between any of his Ledo's Pizza restaurants and Urban Bar-B-Que.

Spearman also stated in his deposition that he viewed the employees at Ledo's Pizza-Seabrook/Lanham, Ledo's Pizza-Greenbelt, and Urban Bar-B-Que as a "common pool to work at multiple locations." J.R. 855. In interrogatory responses, Defendants have acknowledged that at least one employee, John Ukpabi, worked for different restaurants owned by all three companies

in the same pay period, and another, Bryan Flom, worked for SI and RMS during the same pay period. In light of these statements, the Court does not credit Spearman's contradictory assertions in his subsequently filed affidavit that the defendant companies did not share employees and "did not consider employees of one restaurant as employees of all, or any other, restaurants." J.R. 7365; *see Hannah v. United Parcel Serv., Inc.*, 72 F.4th 630, 638 (4th Cir. 2023) (stating that it "well established that 'a party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony'" (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984))).

Even without considering the employee statements specifically disputed by Spearman, the Court finds that the undisputed record evidence establishes that there is no genuine dispute of material fact on whether Defendants operated as a single enterprise. Because the three companies are a single enterprise, the fact that the combined gross sales for 2019 exceeded $500,000 satisfies the gross sales requirement for the entire enterprise, including JMS. *Hamad*, 867 F.2d at 809 (finding that the revenue requirement was met based on the aggregate sales of two companies comprising a "single enterprise"); *Chao v. A-One Med. Servs.*, 346 F.3d 908, 916 (9th Cir. 2003) (holding that where two companies comprised a single enterprise, the fact that one met the revenue requirement by itself established that the single enterprise met that requirement). Likewise, the fact that some part of the enterprise engages in interstate commerce, specifically, that SI and RMS received shipments from its Virginia supplier, U.S. Foods, satisfies the requirement for the entire enterprise. *See Hamad*, 867 F.2d at 806 (finding that a single enterprise met the interstate commerce requirement). Accordingly, the Court finds that the activities of all three companies during the relevant time period are covered by the FLSA.

17

## IV.    Joint Employers

The Secretary also seeks summary judgment on the issue of whether Defendants are liable as joint employers under the FLSA.  Under the doctrine of "joint employment," a worker's employment by joint employers is "one employment" for purposes of determining compliance with the FLSA, and joint employers are "jointly and severally liable for any violations of the FLSA." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 134 (4th Cir. 2017) (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 305, 307, 310 (4th Cir. 2006)).  Generally, two or more persons or entities are joint employers when they are "not completely disassociated" with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Id.* at 141.  The Fourth Circuit has established a six-factor analysis to determine whether entities are joint employers, consisting of:

(1)   Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

(2)   Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3)   The degree of permanency and duration of the relationship between the putative joint employers;

(4)   Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5)   Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6)   Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

18

*Id.* at 141-42. "[O]ne factor alone can serve as the basis for finding that two or more persons or entities are 'not completely disassociated' with respect to a worker's employment if the facts supporting that factor demonstrate that the person or entity has a substantial role in determining the essential terms and conditions of a worker's employment." *Id.* at 142.

Here, a review of the record evidence demonstrates that Defendants are joint employers of the employees at SI, RMS, and JMS. As Spearman acknowledged in his deposition, both formally and as a matter of practice, through his sole ownership and day-to-day activities, Spearman had the "power to direct, control, or supervise the worker, whether by direct or indirect means." *Id.* at 141. Spearman specifically stated that he has the power to hire and fire the employees of all three companies. Because Spearman held exclusive ownership over all three entities for the entirety of their operations, there was a high degree of permanency and duration among the putative joint employers. As discussed above, Spearman also, through shared management and ownership interest in SI, RMS, and JMS, had established common control across the three companies. *See supra* part III.B. Similarly, the work at all three entities occurred on "premises owned or controlled" by Spearman. *See Salinas*, 848 F.3d at 141. Lastly, Spearman has admitted facts showing that Spearman and the three entities jointly shared or allocated responsibility for employer functions, in that he stated that he created and implemented payroll policies at SI, RMS, and JMS, including establishing payroll deductions for the cost of uniforms, and that he personally handled or reviewed payroll information that was sent to a single payroll company, including processing payroll for multiple entities on the same computer system in a single store. Defendants have not provided contrary facts that would refute a finding that Spearman and the entities are "not completely disassociated" with respect to their employees. *Salinas*, 848 F.3d at 141. The Court

therefore finds that there is no genuine dispute of material fact on the issue of whether Defendants are joint employers for purposes of the FLSA.

## V.     Recordkeeping

The Court next addresses the specific alleged violations of the FLSA. The Secretary seeks summary judgment on the issue of Defendants' liability for violating the FLSA's recordkeeping requirements by failing to maintain accurate records of all employees' daily and weekly hours for the time period from April 3, 2016 through June 11, 2021, the date on which Spearman admitted in a deposition to recordkeeping violations. The FLSA requires that every covered employer "shall make, keep, and preserve . . . records of the persons employed" and of "the wages, hours, and other conditions and practices of employment maintained" by the employer, and "shall preserve such records for such periods of time" required by regulation. 29 U.S.C. § 211(c). Regulations promulgated to enforce this provision specify that employers must "maintain and preserve payroll or other records" for "each employee" to whom the minimum wage and overtime provisions apply. 29 C.F.R. 516.2(a). These records must include, among other information, each employee's "[n]ame in full," the "[r]egular hourly rate of pay for any workweek in which overtime compensation is due," the "[h]ours worked each workday and total hours worked each workweek," the "[t]otal wages paid each pay period, and a breakdown between the "[t]otal daily or weekly straight-time earnings or wages . . . exclusive of premium overtime compensation" and the "[t]otal premium pay for overtime hours." 29 C.F.R. § 516.2(a)(1), (7)-(9), (11). These payroll records must be preserved for at least three years. 29 C.F.R. § 516.5(a). These recordkeeping obligations are "stringent" and "vital in ensuring employer compliance with [the FLSA]." *U.S. Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 287 (4th Cir. 2019).

20

There is no genuine dispute of material fact on whether Defendants failed to comply with these recordkeeping requirements. Spearman has admitted to failing to maintain complete and accurate payroll-related employment records. For example, Defendants have admitted that the dates of hire, separation, or both for 50 known employees are "presently unknown." J.R. 134-37. As stated at the hearing on the Motion, Defendants were made aware of the DOL investigation on December 21, 2016, but SI has admitted that that it had "no time records" for the period prior to March 11, 2018, J.R. 140, in violation of the FLSA requirement that a company retain such records for three years. 29 C.F.R. § 516.5. Even for the post-2018 records, SI has stated that "[o]nly some of the records have survived over[]time." J.R. 140. RMS and JMS have stated that they lack knowledge of "all of the time periods that the employees worked" and that the time periods are only "partially reflected in the pay stubs and W-2 forms previously supplied in discovery." J.R. 277-78, 434-35.

Spearman, on behalf of all three companies, has admitted that the records retained for the time period from at least 2016 to 2018 sometimes had inconsistencies or errors, including in the entries for employees' hours worked and weekly pay. Notably, Spearman, on behalf of RMS, has stated in a deposition that he had a list of RMS and JMS employees with inaccurate hours reflected in their records during that time period. Spearman also admitted to inaccurate deductions on the payroll records. These admissions are consistent with Investigator Villarreal's account that during her investigation, Defendants produced only "partial payroll, time records, and a 2019 tip summary sheet" across the time period from April 3, 2016 to January 3, 2022. J.R 1646. Indeed, the payroll records provided by Defendants and their payroll companies do not cover all pay periods for all employees and do not always provide hours worked for each employee.

21

Defendants argue that, regardless of the current state of their records, they complied with the FLSA because they made contemporaneous records, and the loss of certain records is attributable to DOL taking custody of the records produced by Defendants as part of the DOL investigation of this case, the failure to transfer all records when a new computer system was adopted, and the disposal by a third party of certain stored JMS records without Defendants' consent.  Even if some of these claims are true, they do not provide a basis to escape liability for recordkeeping violations.  As discussed above, FLSA regulations require the records to be kept for three years.  29 C.F.R. § 516.5.  Based on the tolling agreement between the Secretary and Defendants, all of the Secretary's claims brought against Defendants were deemed to have been filed on April 3, 2018.  Thus, Defendants necessarily needed to have maintained the required records dating back to April 3, 2015.  They have admitted to not doing so.  The Secretary is therefore entitled to summary judgment on liability for violations of the recordkeeping requirements of 29 U.S.C. § 211(c).

## VI.    Minimum Wage

The Secretary also seeks summary judgment on liability on its claim that Defendants violated the FLSA's minimum wage provisions.  The FLSA requires an employer to pay each employee the federal minimum wage of $7.25 for each hour worked.  29 U.S.C. § 206(a).  The Secretary argues that, from at least April 3, 2016 through at least January 3, 2022, Defendants took steps, including adjusting and deducting employees' hours worked, that resulted in certain employees receiving less than $7.25 per hour.  According to Investigator Villarreal, she determined during her investigation that Defendants "failed to pay 181 employees the federal minimum wage" during the relevant time period.  J.R. 1649.  In their declarations, multiple employees state that they were not paid the minimum wage.  Significantly, although Defendants assert that the "vast

22

majority" of their employees received a minimum wage, they do not dispute that some employees did not receive the minimum wage. Opp'n at 15.

In its interrogatory responses, RMS admitted that it paid at least seven employees below the minimum wage before any deductions across multiple pay periods, including Devonta Hallman, who was paid $4.43 per hour in at least two separate pay periods. RMS acknowledged in its interrogatory responses that it paid Plumpter below the minimum wage on September 25, 2017, when he was paid at a rate $5.79 per hour prior to deductions for food. Thus, by their own admissions, Defendants violated the minimum wage requirements at least as to the employees who did not receive the hourly minimum wage even before any deductions.

In so ruling, however, the Court does not grant summary judgment on whether Defendants violated the minimum wage requirement for employees whose formal hourly rate was at or above $7.25 per hour but whose actual hourly rate fell below that level because of deductions. At the hearing on the Motion, the Secretary's counsel stated that DOL is not arguing that deductions for food, uniforms, or a shortage in the cash register were improper or result in minimum wage violations. While the Secretary argues that, as asserted by certain employees, there were other, improper deductions because Spearman engaged in "shaving hours," Mot. Summ. J. at 32, Spearman has denied that allegation and stated that any reductions in the number of hours worked that he entered into the payroll system were based on his conclusion that the hours were not actually worked, or were based on an error that was corrected by adding the hours and wages earned to the next paycheck. Because the Secretary has not claimed that food, uniform, or shortage deductions were improper, and there is a genuine dispute of material fact on whether other deductions were justified or not, the Court will not grant summary judgment as to minimum wage violations based on allegedly improper deductions.

Nevertheless, the Court finds additional minimum wage violations relating to tipped employees. The Secretary asserts that Defendants violated the minimum wage requirements by paying certain employees who received tips below the minimum wage and failing to comply with the requirements of the FLSA's "tip credit" provision, which allows employers to pay employees hourly wages of only $2.13 per hour if the employees receive tips that raise their total pay to at least $7.25 per hour and certain other conditions are met. 29 U.S.C. § 203(m)(2). To be eligible to apply the tip credit under the FLSA, an employer must have: (1) paid employees at least $2.13 per hour as base pay; (2) informed the relevant employees that the tip credit was being claimed; and (3) allowed the employees to retain all tips that they received, except that tips may be pooled among employees who "customarily and regularly receive tips." 29 U.S.C. § 203(m)(2); *Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 680-81 (D. Md. 2012). The latter two requirements are "strictly construed." *Dorsey*, 888 F. Supp. 2d at 681. The notice provision "normally requires that an employer take affirmative steps to inform affected employees of the employer's intent to claim the tip credit." *Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 27 (1st Cir. 2014); *see Kilgore v. Outback Steakhouse*, 160 F.3d 294, 298 (6th Cir. 1998).

"It is the employer's burden to show that it has satisfied all the requirements for tip-credit eligibility." *Perez*, 769 F.3d at 27. FLSA regulations require that the employer produce records for these employees, including the "[a]mount by which the wages of each tipped employee have been deemed to be increased by tips" and the "[h]ours worked each workday in occupations in which the employee receives tips, and total daily or weekly straight-time earnings for such hours." 29 C.F.R. § 516.28(a).

Although Defendants assert that they complied with the tip credit provision requirements and are therefore entitled to claim the tip credit, the record evidence does not support that assertion.

24

First, through their interrogatory responses, they have admitted that at least eight tipped employees did not receive any hourly wage, much less one of $2.13 per hour or higher. Moreover, in responses to requests for the production of documents, Defendants admitted that they retained records supporting the application of the tip credit only for 2019 and did not keep records supporting the application of the tip credit for 2016 to 2018 and 2020 to 2021. Defendants are therefore unable to meet their burden to establish that the tip credit applied to certain employees or to confirm that their tipped employees ultimately were paid sufficient tips to meet the federal minimum wage. Indeed, multiple tipped employees, including employees working at Ledo's Pizza-Greenbelt and Ledo's Pizza-Bowie, have stated in their declarations that their tips did not raise their hourly rate to the federal minimum wage.

Further, the evidence does not support the conclusion that all tipped employees claimed to be subject to the tip credit received the required notice. Even if the four notification forms submitted could be deemed to have satisfied the notice requirement, Defendants have not produced notification forms for the 19 employees identified by Defendants as subject to the tip credit.

The Secretary also argues that Defendants are not eligible to apply the tip credit because Spearman and other employees received a portion of the tips earned by tipped employees outside of a qualifying tip pool arrangement. In the employee declarations and statements, at least two employees assert that they were required to share tips with other employees: one RMS employee stated that employees "had to share the cash tips from the tip cup with [Spearman]" to be divided between Spearman and the cashiers, J.R. 1248, and another RMS employee stated that servers had "to share the tips [they] received with other employees," J.R. 1221. For his part, Spearman denies these allegations and has instead asserted that servers kept all of their tips and that Defendants did not receive any portion of their tips.

Nevertheless, even if the question of whether Spearman or others improperly received portions of the tips is the subject of a genuine issue of material fact, the fact remains that Defendants had tipped employees who were paid no hourly wage at all, and they have not provided sufficient evidence to show that they complied with all of the other requirements to be eligible for the tip credit, including the requirements of proper notice to the employees and maintenance of records to show that the amount of tips was sufficient to result in total pay at or above the minimum wage. Accordingly, the Court finds no genuine dispute of material fact on whether Defendants violated the FLSA minimum wage requirements and will grant summary judgment to the Secretary on liability on the minimum wage claim.

**VII.   Overtime Pay**

The Secretary also seeks summary judgment on liability for violations of the FLSA overtime pay provisions during the relevant time period. Under this provision, "no employer shall employ any of [their] employees . . . for a workweek longer than forty hours unless such employee receives compensation for [] employment in excess of [forty hours] specified at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). An employee's "regular rate" is the hourly rate that the employer pays the employee for a normal, 40-hour workweek, but that "fixed amount must be sufficient to provide compensation at a regular rate not less than the minimum hourly rate." *Flood v. New Hanover Cnty.*, 125 F.3d 249, 252 (4th Cir. 1997).

During her investigation, Investigator Villarreal concluded that 36 current and former employees were owed overtime pay across the relevant time period. Although Defendants claim in their brief that they paid required overtime to "the vast majority of employees," they do not dispute that they did not pay overtime to all employees who worked more than 40 hours per week.

Opp'n at 21. Rather, Spearman admitted in his deposition that "multiple employees" were not paid overtime after working more than 40 hours in a week. J.R. 541. For example, Spearman, in his deposition on behalf of RMS, admitted that Ana Julia Morena Canales, an RMS employee, worked overtime hours but received only straight-time pay for those hours. Spearman similarly admitted in his deposition on behalf of JMS that Eric Knott, a JMS employee, was not paid overtime for multiple pay periods.

Defendants also failed to aggregate hours when employees worked at multiple locations, resulting in a failure to pay at the overtime rate. For example, in Spearman's deposition on behalf of SI, he admitted that John Ukpabi had worked at Ledo's Pizza-Seabrook, Ledo's Pizza-Greenbelt, and Urban Bar-B-Que, covering all three companies, during the same pay period, such that his total hours worked exceeded 40 in a week, but he was not paid at the overtime rate for his overtime hours. As a result, Ukpabi did not receive overtime pay in at least 17 pay periods. As reflected in interrogatory responses, Bryan Flom, an employee who worked at Ledo's Pizza restaurants owned by SI and RMS during the same pay period, also did not have his hours aggregated and therefore was not paid required overtime for at least five pay periods. Indeed, in interrogatory responses on behalf of SI, Defendants acknowledged that the payroll systems they used were not configured to recognize overtime hours or overtime pay rates.

In light of this evidence, Defendants' assertion that employees only worked overtime in "a few isolated cases," Opp'n at 21, does not change the fact that the record evidence establishes that Defendants, by their own admission, failed to pay overtime to certain employees working more than 40 hours per week. Thus, there is no genuine dispute of material fact as to whether Defendants violated the overtime pay provisions of the FLSA, and the Court will grant the Motion as to liability on that claim.

27

## VIII.  Willfulness

The Secretary argues that the record evidence demonstrates that Defendants' violations were willful.  Under the FLSA, the statute of limitations for minimum wage and overtime violations is two years unless it can be shown that the violations were "willful," in which case the statute of limitations is three years.  29 U.S.C. § 255(a).  The issue of willfulness is typically a question of fact, and the burden of proof is on the plaintiff to establish it.  *See Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015).  A "willful violation" exists when "[t]he employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  An employer recklessly disregards the FLSA's requirements "if the employer should have inquired further into whether its conduct was in compliance . . . and failed to make adequate further inquiry."  29 C.F.R. § 578.3(c)(3).  However, a "good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects" is not a willful violation. *McLaughlin*, 486 U.S. at 135.  Thus, negligence or unreasonableness does not establish willfulness without evidence of recklessness. *Desmond v. PNGI Charles Town Gaming, L.L.C.,* 630 F.3d 351, 358 (4th Cir. 2011)*; Sanchez Carrera v. EMD Sales, Inc.,* 402 F. Supp. 3d 128, 150-51 (D. Md. 2019).

The Court declines to rule on the issue of willfulness at this time.  The parties entered into a tolling agreement, dated April 3, 2018, in which they agreed that in exchange for the Secretary refraining from filing a civil action without first giving 30 days of notice to Defendants, the statute of limitations would be tolled in that any civil enforcement action initiated against Defendants would be deemed to have been filed on April 3, 2018.  In the Amended Complaint, however, the earliest time period for which the Secretary is seeking to establish liability and damages for FLSA violations is from April 3, 2016 to April 3, 2018, which would fall within the general two-year

28

statute of limitations under 29 U.S.C. § 255(a). Thus, under these circumstances, a finding on willfulness would have no impact on the time period for which violations and damages could be found. At the hearing, the parties agreed with this conclusion.

Although the DOL counsel argued, for the first time at the hearing, that a finding on willfulness is necessary to establish the availability of injunctive relief, the Secretary has cited no authority for this proposition. The FLSA provision granting district courts the authority to order injunctive relief does not condition the grant of an injunction on a finding of willfulness. *See* 29 U.S.C. § 217. Pursuant to this provision, courts may "look at many factors in determining whether to grant a prospective injunction, including the employer's previous conduct, its current conduct, and the reliability of its promises of future compliance." *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997); *see Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992). Although at least one court has considered the issue of whether there was "bad faith" in determining whether to issue an injunction, *Martin*, 963 F.2d at 114, the Secretary has identified no legal authority establishing that a finding of willfulness is necessary in order for a court to grant injunctive relief in an FLSA case  Under these circumstances, the Court need not and does not address whether willfulness has been established.

## IX.    Liquidated Damages

Lastly, the Secretary argues that the Court should grant summary judgment on the issue whether Defendants are liable for liquidated damages for their FLSA violations. Under the FLSA, "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b); *see id.* § 216(c) (providing that "the Secretary may bring an action in any court

of competent jurisdiction to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages"). Liquidated damages "are considered compensatory rather than punitive in nature" and are awarded in order to compensate for damages associated with the withholding of employees' pay that are "too obscure and difficult of proof for estimate" by other means. *Roy v. Cnty. of Lexington*, 141 F.3d 533, 548 (4th Cir. 1998) (citations omitted). A court, however, "in its sound discretion," may award no liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260.

To meet this standard, an employer has the "plain and substantial burden of persuading the court by proof that [the] failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose . . . more than a compensatory verdict." *Richard v. Marriott Corp.*, 549 F.2d 303, 306 (4th Cir. 1977) (quoting *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir. 1960)); *see also Lockwood v. Prince George's Cnty.* 58 F. Supp. 2d 651, 657 (D. Md. 1999) (holding that a defendant employer must establish that it acted with "subjective good faith and objective reasonableness"), *aff'd*, 217 F.3d 839 (4th Cir. 2000). However, in FLSA cases, double damages are considered the "norm," while single damages are treated as the "exception." *Lockwood*, 58 F. Supp. 2d at 657 (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)).

In this context, a defendant must show more than blissful ignorance of the FLSA's requirement and instead must show "that it did not take an 'ostrichlike' approach to the Act." *Roy*, 141 F.3d at 548-49. In *McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235, 245 (4th Cir. 2016), the Fourth Circuit upheld the application of this good faith defense to liquidated

damages as to certain FLSA violations where the defendant had consulted with counsel and acted in accordance with that advice, but found that the good faith defense was not available for the time period prior to the consultation with counsel because "[i]f mere assumption amounted to good faith and reasonable belief of compliance, no employer would have any incentive to educate itself and proactively conform to governing labor law." *Id.* at 245. Accordingly, to meet this standard, an employer typically must show that it made some affirmative efforts to consult with counsel or others with specialized knowledge to determine whether its actions were in compliance with the FLSA. *See id.*; *Roy*, 141 F.3d at 548-49 (holding that a defendant employer demonstrated good faith through consultation with counsel on FLSA compliance and making modifications to its compensation structure).

In arguing that they acted in good faith, Defendants do not point to any evidence that they made the necessary efforts to meet this standard. Although Spearman has acknowledged that he was generally aware of the minimum wage and overtime requirements of the FLSA, there has been no claim or evidence that Defendants consulted with an attorney, auditor, or other knowledgeable source, or that they had a particular legal theory under which they acted in failing to pay minimum wages or overtime pay. Rather, Defendants argue only that any violations of the FLSA "involved very few employees in very few instances," that they generally received no complaints about pay, and that any errors were honest errors. Opp'n at 24. However, "good faith is 'not demonstrated by the absence of complaints on the part of employees.'" *Lockwood*, 58 F. Supp. 2d at 658 (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)). Thus, even without considering the declarations by multiple employees stating that Defendants refused to correct minimum wage or overtime issues when presented to them, and by at least two employees stating that they were told by Spearman that he did not pay overtime, the Court finds that Defendants have

31

not presented sufficient evidence to meet their burden of establishing good faith within the meaning of the FLSA so as to avoid liability for liquidated damages. The Court therefore grants summary judgment on the issue of whether Defendants will be liable for liquidated damages for their violations of the minimum wage and overtime provisions of FLSA.

## CONCLUSION

For the foregoing reasons, the Secretary's Motion for Partial Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in that the Court finds all Defendants liable for violations of the recordkeeping, overtime, and minimum wage provisions of the FLSA, and that Defendants are liable for liquidated damages. In so ruling, the Court does not find any particular number of FLSA violations, number of employees subjected to such violations, or any particular amount of unpaid wages owed. The Motion will be otherwise denied. A separate Order shall issue.

Date:  February 16, 2024

THEODORE D. CHUANG
United States District Judge